## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

REID HYKEN,

     Plaintiff,

v.

KELLI VAN GINHOVEN,
ROBERT LAMARCHE,
SAM POULIOT, and
THE CITY OF ESCANABA,

     Defendants.

Case No.:     25 – cv -  46

Hon.:

Collin H. Nyeholt (P74132)
LAW OFFICES OF CASEY D.
CONKLIN, PLC
Attorneys for the Plaintiff
4780 Okemos Road, Ste 2.,
Okemos, MI 48823
Phone: (517) 522-2550
Fax: (517) 227-5866
collin@caseydconklin.com

## COMPLAINT and JURY DEMAND

## STATEMENT OF THE CASE

This is a case of cronyism in local politics run amok. Kelli Van Ginhoven ran for the Delta County Board of Commissioners. After she announced her candidacy, Reid Hyken learned that she may have misrepresented her residency status and, therefore, would not have been eligible. He reported her to law enforcement. And he personally began collecting evidence: photographs of the supposed residence, taken in the evening and from the outside, depicting it in an empty state and in order to disprove her claim that she was residing there. In response, Van Ginhoven colluded with Robert LaMarche, the Director of Public Safety for the City of Escanaba, and other officers in order to have Hyken baselessly charged with "stalking." Van Ginhoven then used the pending "stalking" charge to gain advantage over her opponents in her campaign, to prevent Mr. Hyken from attending Commission meetings to speak against her at Board meetings, and to stop him from making statements critical of her on social media. This suit seeks to remedy this blatant violation of Mr. Hyken's rights.

## PARTIES and JURISDICTION

1.    Plaintiff REID HYKEN maintains a permanent residence in Delta County, and his principal place of business is in the City of Escanaba, which are within the jurisdictional bounds of the Northern Division of the United States District Court for the Western District of Michigan.

2.    Defendant KELLI VAN GINHOVEN, currently and throughout the time of the events described in this Complaint, owned and operated a business located within the City of Escanaba and maintained permanent residence within the Northern Division of the Western District.

3.    Defendant ROBERT LAMARCHE was, throughout the time of the events described in this Complaint, the Director of Public Safety for the City of Escanaba. During his term as

Director of Public Safety he was the highest-ranking officer in the Escanaba Public Safety Department ("EPSD"). He currently maintains a permanent residence in Delta County.

4.      Defendant SAM POULIOT was, throughout the time of the events described in this Complaint, a Detective serving on the Department of Public Safety for the City of Escanaba.

5.      Defendant CITY OF ESCANABA is a Michigan municipality located within Delta County.

6.      The Court may exercise general *in personem* jurisdiction over the defendants because of their permanent presence within the geographical bounds of the Court.  In the alternative the Court may exercise specific jurisdiction over the dispute because the events giving rise thereto occurred due to the Defendants' acts and omissions within the Court's geographical bounds.

7.      Venue is properly laid in the Western District of Michigan's Northern Division pursuant to 28 USC §§ 1391(b)(1) and (b)(2).

8.      The Court may exercise Subject Matter Jurisdiction over the claims emanating from federal law pursuant to 28 USC § 1331.  The Court may exercise supplemental jurisdiction over the state law claims pursuant to 28 USC § 1367.


## GENERAL ALLEGATIONS

9.      David Moyle was elected to the Delta County Board of Commissioners District 4 seat in 2010. He served on the Board of Commissioners continuously until 2023. Plaintiff HYKEN supported Mr. Moyle as a candidate and frequently expressed support for him as a Commissioner in public statements, letters to the editor of local papers, and on social media.

10.     Defendant VAN GINHOVEN decided to run for Mr. Moyle's seat on the Board of Commissioners during the 2022 election cycle.

11.    In order to be eligible as a candidate for the District 4 seat, VAN GINHOVEN was required to have resided in the City of Escanaba for a period of not less than 30 days prior to filing documents in furtherance of her candidacy with the Delta County Clerk. As of 2022, VAN GINHOVEN and her husband owned a house in Bark River, Michigan outside of the City of Escanaba and this was their primary residence. But she also owned and operated a business called "For the Love of Cupcakes" in downtown Escanaba. On or about May 25, 2022, VAN GINHOVEN changed the primary address on her driver's license to her business address. Then, on or about June 27, 2022, VAN GINHOVEN filed documentation in support of her candidacy with Delta County Clerk Nancy Przewrocki wherein she claimed that her primary residence was within the City of Escanaba based upon the address for the cupcake business.

12.    Plaintiff HYKEN owned a business in downtown Escanaba not far from VAN GINHOVEN'S cupcake shop. He was therefore able to observe that VAN GINHOVEN was not ever there during the evening hours and it did not appear that she truly had made this her primary residence as she had claimed. He therefore had good reason to believe that she had misrepresented her eligibility for the District 4 seat for which she was running.

13.    Plaintiff HYKEN expressed his concerns about VAN GINHOVEN's eligibility for the District 4 seat in various comments and interactions on social media and in public comment at board meetings.

14.    Under Michigan law, a person who makes a false affidavit or swears falsely under oath for the purpose of qualifying as a candidate for elective office commits perjury punishable by a fine of $1,000, imprisonment in a state prison for not more than 5 years, or both. MCL §168.933; MCL § 168.935.

15.     On or about July 7, 2022, Plaintiff HYKEN reported VAN GINHOVEN to the Michigan Department of State Police (the "MSP") for election fraud and on July 7, 2022, the MSP began an investigation of same which it referred to as Incident Number 084-0000990-22.

16.     On July 20, 2022, MSP Trooper Povich went to VAN GINHOVEN'S purported residence at the cupcake shop and informed her of the nature of the allegations against her. In response, VAN GINHOVEN told Trooper Povich that she had "been living in the apartment with one daughter while her husband gets their house ready to sell" and "they plan on building in Escanaba."

17.     Meanwhile, Plaintiff HYKEN continued to collect evidence to support his assertion that VAN GINHOVEN was not maintaining a permanent residence in the cupcake shop in Escanaba. He would drive by the building in the evening hours and take pictures of the *exterior* of the building which were designed to demonstrate that the building was not currently occupied at those times. At no time did Plaintiff photograph the *inside* of the building or take any photographs of Defendant VAN GINHOVEN's other family members; they were never at the location when he collected his documentation. And, at no time did Plaintiff HYKEN enter Defendant VAN GINHOVEN's property. It was readily apparent from the darkened exterior that it was not occupied or being used as a residence and this could be observed and recorded from public thoroughfares adjacent to the building. Plaintiff's activities consisted of driving his vehicle on public streets and taking photographs of the outside of a building from his location in same.

18.     On August 23, 2022, VAN GINHOVEN's husband Bjorn contacted the Escanaba Public Safety Department and reported that Plaintiff's SUV had been observed in the public alleyway behind the cupcake shop. PSO Codere and PSO Dishaw responded. When the EPSD officers

spoke to Plaintiff he "**indicated that his actions were politically motivated as his good friend was running against Kelli for county commissioner.**" This was all documented by the responding officers in their report, Incident Number 22-005895, that they entered that day.

19.    Defendant VAN GINHOVEN was able to garner influence with Defendant LAMARCHE. The two entered into ongoing discussions on how to stop Plaintiff from his efforts to document and challenge her for her apparent ongoing election fraud.

20.    On August 23, 2022, Defendant LAMARCHE emailed Defendant VAN GINHOVEN from his official "Escanaba.org" email address. He told her

>    There are a few options we can take.

>    I can have an officer stop by and you can file a formal complaint. Our officer would then make contact and have a chat with him laying out your concerns. Depending on how the conversation goes it may stop him or he may increase his behavior. The report would then be documented with the officer's findings. You could then get the report and attempt to get a Personal Protection Order from the courts to stop his behavior.

>    **I can have an officer stop by as in Option 1. Upon the conclusion of the investigation the officer can submit a warrant for stalking. The prosecutor would review the case and would either authorize or deny the warrant.**

>    You can make a report, and we do not make contact with him. However, in light of the recent events and his response to you I don't think this is a very good option.

>    You continue to document his behavior like you have and a report is not made.

>    I know this is a tough decision, but let me know how  you would like to proceed. If you would like to speak to an officer, I will send one over immediately.

21.    On August 24, 2022 Defendant VAN GINHOVEN responded to the foregoing email Defendant LAMARCHE and wrote:

>    Thank you for the quick response, Rob. I appreciate you. After calming down and giving it thought, I would like to proceed. **I would like to proceed with option 2 please.** I am here at my shop 4pm or tomorrow 9:30 am-4pm.

22.    The "shop" VAN GINHOVEN referred to in this email was the same "shop" that she had told the Michigan State Police and the Delta County electorate was her "primary residence." Her statement that she would only be present at the shop during business hours *should* have signaled to Defendant LAMARCHE that there was, at least, *some* validity to Plaintiff's concerns that she was not *really residing* there as she had claimed. But LAMARCHE ignored this detail.

23.    As of August 24, 2024, Defendant LAMARCHE knew or should have known that Plaintiff had political motivation for his documentation of Defendant VAN GINHOVEN by reason of the August 23rd contact with Plaintiff that his officers had reported. But he chose to ignore this information and proceed against Plaintiff anyway.

24.    The following day, August 25th, Defendant LAMARCHE responded to Defendant VAN GINHOVEN from his official email account and said "**Sounds like a plan.** I'll be sending a detective down to talk to you today."

25.    The above quoted email correspondence are themselves public records, and are recited verbatim in the report that Defendant POULIOT filed related to Incident Number 22-005900, all of which are subject to the Freedom of Information Act.

26.    In the publicly available email correspondence noted above, Defendant LAMARCHE diverted the authority to decide how the EPSC would police the situation with Plaintiff HYKEN to Defendant VAN GINHOVEN. VAN GINHOVEN chose, among alternatives, the option that would cause the EPSD to procure arrest authority against him for his political activities and attempts to document evidence of her criminal perjury. Defendant LAMARCHE wrote back that that "sounds like a plan" because it *was* their "plan."

27.    Absent from the "plan" that LAMARCHE and VAN GINHOVEN agreed to was any indication that LAMARCHE's Detective, after interviewing the parties involved, could conclude

7

that there was *not* probable cause to proceed with criminal charges. The presence or absence of probable cause was not a consideration; the "plan" apparently was to have one of LAMARCHE's Detective feign an investigation by documenting a brief conversation with those involved and then proceed to seek a warrant and criminal prosecution against Plaintiff *no matter what anyone said*.

28.    The Detective that Defendant LAMARCHE sent to follow up on the "plan" on August 25th was Defendant Detective SAM POULIOT. Detective POULIOT documented his actions in a report he filed as EPSD Incident No. 22-005900. This Report reveals that Defendant POULIOT reviewed the email exchange referred to above; he copied it verbatim into the Report. According to Defendant POULIOT, when he spoke to Defendant VAN GINHOVEN she admitted that she knew HYKEN's actions towards her were politically motivated, stating that "[t]he fact that she was running for the Delta County Commissioner and was running against David Moyle was where this started." POULIOT reported that when he spoke to Plaintiff, "Reid told me Kelli van Ginhoven was running for the county board," "Kelli lives in Shaefer, and [he] knows she has to live within the district she is running for," "the state police were investigating her (where she resided), and he wanted more evidence, in case the state police did not conduct a full investigation," and "he [HYKEN] has no intention of harming Kelli, but made a comment that if she won the election, he would be upset." Defendant POULIOT quoted Plaintiff HYKEN as saying to him "**Yea I'm taking pictures, taking pictures of a vacant apartment at night because the law says she has to live there more than half the time.**"

29.    Defendant POULIOT, per the "plan" between VAN GINHOVEN and LAMARCHE to which he had acquiesced, proceeded to submit a warrant request on Plaintiff Hyken for "Stalking, violating MCL 750.41h" that same day, August 25, 2022. When he submitted this

warrant request, Defendant POULIOT was well and fully aware that Plaintiff's actions were designed to (1) engage in the political process by proving that VAN GINHOVEN was ineligible for the office for which she was running and (2) document the believed commission of a crime, perjury in a state election. POULIOT therefore knew, or should have known, that probable cause of a crime was utterly absent.

30.    On August 29, 2022, Defendant POULIOT contacted Sergeant Janisse of the Michigan State Police Gladstone Post who confirmed that the MSP had investigated a report of election fraud pertaining to VAN GINHOVEN's residence. Defendant POULIOT then procured a copy of MSP's report and noted that this had occurred in the Escanaba Public Safety Department's own report. Even though he had confirmed the accuracy of Plaintiff's statement to him that his actions involved collecting evidence for a pending criminal investigation, Defendant POULIOT took no action to withdraw his warrant request.

31.    In November of 2022, the voters had their say and Defendant VAN GINHOVEN lost her bid for the District 4 seat. David Moyle retained his role as the District 4 representative for the Delta County Board of Commissioners.

32.    But VAN GINHOVEN's political ambitions were not so small as to be defeated by the voters' rejection of her bid for power. Defendant VAN GINHOVEN seized upon the controversy over the DeSalvo termination and, over the next several months, used it to foment community support for the recall of Moyle and the other Commissioners who had voted for DeSalvo's termination. VAN GINHOVEN, of course, would be the one to assume Moyle's seat should this prevail. As described to follow, VAN GINHOVEN and her followers leveraged ongoing criminal "stalking" charges against Plaintiff HYKEN to their advantage in this campaign.

33.    On February 7, 2023, the Delta County Board of Commissioners, during a highly contentious and emotionally charged meeting, voted to terminate the employment of Emily DeSalvo, the County Administrator. Commissioner Moyle, together with Commissioners Bob Barron and Robert Peterson, voted in favor of De Salvo's termination. The two remaining commissioners voted against.

34.    Plaintiff HYKEN had spoken in favor of the Board's decision at the February 7th Commission meeting. And he proceeded to send a letter to the editor to the local newspaper, the Daily Press, expressing his views in favor of the Board's termination decision.

35.    On February 9, 2023, Defendant VAN GINHOVEN posted a public response on her Facebook that noted that "Reid Hyken put a Letter to the Editor in the Daily Press today about me. It's very disturbing and full of untruths." She then went on to discredit HYKEN personally by referring to the pending criminal charges to gain public sympathy and bolster her political position, saying

> [d]uring my campaign, this man on a nightly basis, drove thru the alley where I live taking photos of my apartment. Nightly. For months. Just rolling through the alley with his window down, taking photos of my place of residence. I have video to prove it. He refused to stop, even when my husband and law enforcement got involved. Even my neighbors next door had enough of him. He told law enforcement he was "doing research."

She went on to complain about Plaintiff's social media criticisms, saying that "[h]e [Plaintiff HYKEN] also used the Facebook platform of Escanaba Rants and Raves to spread lie after lie about me and my family using the fake profile name Sally Menilla."

36.    On February 14, 2023, Defendant VAN GINHOVEN spoke at the Delta County Board of Commissioners' meeting. She accused David Moyle of "failure of leadership," opined that he was "unfit" to hold his position, and called upon him to resign.

37.    On March 28, 2023, Plaintiff was arrested on the charge of "stalking" Defendant VAN GINHOVEN. That same day, Plaintiff was released on pretrial bond. As a condition of his bond, the Court ordered Plaintiff not to "leave the State of Michigan without the permission of this court[,]" "use alcohol[,]" "be in the presence or company of anyone using or possessing alcohol [,]" attend "any bars or taverns where the primary purpose is the sale of alcohol." He was prohibited to "possess or purchase a firearm or other dangerous weapon." He was barred from having "any social media access to any social media whatsoever." And he was also required to observe a curfew between 9:00 PM and 6:00 AM every day, and pay $1,400 for a GPS tether which he was required to wear at all times. These significant restrictions on his liberty remained in effect until the eventual dismissal of the "stalking" charge against him, several months later.

38.    Defendant VAN GINHOVEN had personally advocated for the Court's ban on Plaintiff's social media presence, because she represented to the Court that he had made "threatening statements" to and about her on social media. Really, Plaintiff's social media comments were politically motivated criticisms of VAN GINHOVEN as a candidate for public office. Her representation in judicial proceedings that these were "threats" was a knowing and intentional misrepresentation, designed to cause the court to quiet a vocal source of dissent against her. It worked.

39.    VAN GINHOVEN proceeded to aggressively abuse the bond order in order to stymie any speech against her by Plaintiff that she did not like. On April 1, 2023, Defendant VAN GINHOVEN reported Plaintiff to the EPSD for a "bond violation" because, she claimed, she had been on Facebook and saw Plaintiff's profile had a "green dot" on it which, to her, meant it was "active." The EPSD concluded that this was not dispositive that Plaintiff was using his account and so took no further action.

40.    VAN GINHOVEN also attempted to misuse the pretrial bond order against Plaintiff to prevent him from attending public meetings and speaking against her. On April 4, 2023, the Court at VAN GINHOVEN'S urging entered an Order Regarding No Contact Order and Attendance at Public Meeting. VAN GINHOVEN had sought to exclude him from *any* public meetings, but the Court was cognizant of the first amendment implications and crafted a more precise order. Plaintiff was permitted to attend public meetings but was generally required to "position himself at a location away from" VAN GINHOVEN and not to approach her for any reason or turn away from her if they came face to face.

41.    On April 15, 2023, Defendant VAN GINHOVEN made a spurious claim to the EPSD that Plaintiff had committed a "bond violation" because he was "**not sitting as far from her as he possibly can**" at board meetings even though, as she herself admitted, "**Reid did not speak to [her], he did not gesture to her, and he did not have face to face contact with her.**" The Public Safety Department declined further action, because "[t]he order states that Reid is to position himself 'away' from Kelli but does not specify a specific distance away." Not to be deterred, Defendant VAN GINHOVEN made a *second* complaint to the EPSD again targeting Plaintiff's attendance at board meetings, this time complaining that he "**was parked in the parking space across the lane from her in the parking lot at the county commissioner meeting**." The EPSD declined further action on this nonsense complaint as well. The foregoing is drawn from the publicly available Incident Numbers 23-002244 and 23-002245 by the EPSD.

42.    Meanwhile, Defendant VAN GINHOVEN continued fomenting anger about Moyle's leadership and amassing support for her effort to recall him and assume his position. She and her supporters used the stalking charge against Plaintiff HYKEN in their favor against Moyle. For instance, on April 18, 2023 Andrea Nummilien, a supporter of VAN GINHOVEN'S, made a

Facebook post that said "Commissioner Moyle's best friend was arrested and charged with stalking Moyle's political opponent during the 2022 campaign[,]" that he "lurked in her alley night after night taking photos of her, her home and her teenage daughter[.]" Nummilien concluded, based upon VAN GINHOVEN's misrepresentations that Plaintiff had "stalked" her, that the community should "vote the bullies out May 7ᵗʰ."

43.    On or about July 10, 2023, Defendant VAN GINHOVEN, acting with a group she had formed calling itself "Delta County Citizens for Ethical Leadership," filed paperwork to recall Commissioners Moyle, Barron, and Petersen. Not surprisingly, Defendant VAN GINHOVEN was identified as the individual who, if the recall were successful, would assume Moyle's seat on the Commission.

44.    The pending stalking allegations against Plaintiff HYKEN continued to be central to Plaintiff VAN GINHOVEN's campaign to recall Moyle and take over his seat on the Commission. On July 14, 2023, Dana Vaneffen, another individual involved with Delta County Citizens for Ethical Leadership, posted a lengthy diatribe on social media where she claimed that Plaintiff HYKEN was "Dave Moyle's psycho bff and also Moyles [*sic*] mouthpiece." This publication included a color photo of the 3/28/23 arrest photograph with the words "for stalking" written on it.

45.    The criminal prosecution was transferred from the Delta County Prosecutor to the Menominee County Prosecutor due to a supposed conflict of interest. On October 17, 2023, the Menominee County Prosecutor filed a *nolle prosequi* motion, dismissing the "stalking" charges against Plaintiff HYKEN.

46.    But the nightmare was not over. VAN GINHOVEN proceeded to petition the court on two separate occasions for Personal Protection Orders against Plaintiff HYKEN which sought

essentially the same restrictions upon his liberty as the pretrial bond, including the limitations upon his ability to post about her on social media. In support of one of her applications, VAN GINHOVEN wrote to the Court that "**I am requesting the PPO include the same conditions as this prior bond, as I currently feel both physical & mental anguish due to Mr. Hyken's behavior in my presence and online and I fear for my safety when Mr. Hyken is near.**" Both of her applications were denied.

47.     On November 20, 2023, VAN GINHOVEN reported a supposed "threat" by Plaintiff HYKEN against her to the EPSD. An independent journalist had published a video on YouTube which is, as of this writing, available at www.youtube.com/watch?v=5pxEklWL14Q. The video was critical of the EPSD, and it mentioned the actions that had been taken towards Plaintiff HYKEN. Plaintiff HYKEN had granted the journalist an interview and, during that interview, he mentioned his belief that VAN GINHOVEN had misrepresented her residency and discussed his efforts to bring this to light. In response, VAN GINHOVEN told the EPSD that "REID HYKEN was charged with stalking against her, and the pending case was assigned to Menominee County Prosecutor" and also that "HYKEN took part in a YoutTube video that she felt threatened by." The EPSD investigated but, ultimately, took no action on this because "after reviewing the video several times, VAN GINHOVEN was mentioned several times, but [the EPSD Officer] did not see anything that would be criminal, threatening, intimidating, or harassing." The foregoing information is available in EPSD Incident No. 23-007849.

48.     The Court held a hearing on VAN GINHOVEN's PPO application on December 5, 2023, and denied the request.

49.     After VAN GINHOVEN lost her bid for the personal protective order against Plaintiff, a community member named Kelly Zar asked her in a public discussion section on the Kelli Van

Ginhoven for Delta County Commissioner facebook page "did you ever get a restraining order?" and VAN GINHOVEN responded "he knew how to work the system – he never came onto my property. However, it's not over." VAN GINHOVEN, in this same exchange, commented to Zar that "people always wander into my back alley at the shop and I never worry." VAN GINHOVEN's social media comments reveal that she knew full well that Plaintiff HYKEN's actions were neither threatening nor unlawful.

50.     Plaintiff has suffered significantly because of the Defendants' actions against him. He was made to wear an ankle monitor for seven months. He had to pay a $1,400 deposit and then $5 per day for the ankle monitor, and this ended up costing him over $3,000. He was also barred from engaging in social media, and therefor public debate and political discussion, for this period of time. His reputation has been tarnished, and continues to be tarnished, by the baseless allegation that he is a "stalker" which has been repeated and exaggerated by Defendant VAN GINHOVEN herself and her followers. He has suffered ongoing mental duress as a result of the ongoing criminal prosecution to which he was subjected. And, he has incurred monetary losses in defending himself from these charges against him.

## Count I: First Amendment Retaliation
### 42 USC § 1983
### *As against All Defendants*

51.     In order to prevail on a claim of First Amendment Retaliation Plaintiff must prove (1) that he "engaged in constitutionally protected conduct," (2) "an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct;" and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct. *Fritz v. Charter Tp. of Comstock*, 592 F.3d 718, 723 (6th Cir. 2010).

52.    Plaintiff engaged in the following activities protected by the First Amendment of the United States Constitution:

    a.  Supporting David Moyle as the District 4 Commissioner on the Delta County Board of Commissioners and affiliating with him and his supporters,

    b.  Expressing support for David Moyle publicly at Commission meetings, letters to the editor, and on social media,

    c.  Making a report of criminal perjury by Defendant VAN GINHOVEN to the Michigan State Police,

    d.  Documenting evidence of the perjury by taking public photographs of VAN GINHOVEN's publicly visible property from public locations,

    e.  Expressing opposition to VAN GINHOVEN as a candidate for office, based upon her ineligibility for office due to her apparently false statements as to her residence in the City of Escanaba, and

    f.  Collecting evidence of VAN GINHOVEN's ineligibility for political office by taking photographs of her property visible from the public while in public locations.

53.    It is clearly established that there is a constitutional right to take photographs of people in public places in order to document criminal conduct, and that this right may not be interfered with by application of a state-law anti-harassment statute. *See eg Ness v. City of Bloomington*, 11 F.4th 914 (8th Cir. 2021) (holding precisely that). It is also clearly established that an individual has a First Amendment right to record public officials in public places. *McKay v. Federspeil*, 22 F. Supp. 3d 731, 735 (E.D. Mich. 2014) (collecting cases for this proposition). Only the most incompetent of state officials would be unaware of these rights.

54.    Defendants together took the following adverse actions against Plaintiff:

    a.    Dispatching law enforcement officials to harass and intimidate Plaintiff in an attempt to dissuade him from continuing to collect evidence of Defendant VAN GINHOVEN's criminal perjury and ineligibility for political office,

    b.    Causing an arrest warrant to issue against him, knowing that there was no probable cause to do so,

    c.    Arresting him, knowing that the warrant was invalid as it lacked probable cause,

    d.    Causing criminal charges to be brought against him, in the knowing absence of probable cause,

    e.    Causing him to be subjected to a lengthy and significant restriction upon his liberty during the pendency of the criminal charges.

55.    Each of the aforesaid actions could deter a person of ordinary firmness from engaging in the protected activities that Plaintiff did.

56.    There is a causal connection between Plaintiff's protected conduct identified herein and the adverse actions Defendants took against him. On their face, the criminal prosecution against Plaintiff was premised upon his protected conduct of recording Defendant VAN GINHOVEN, in public, for purposes of engaging in the political process and documenting evidence commission of a crime.

57.    "It is well settled that private parties … who jointly participate with a state to engage in concerted activity, are regarded as acting 'under the color of state law' for the purposes of § 1983." *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 478 (6th Cir. 2014). Defendant LAMARCHE offered Defendant VAN GINHOVEN authority to decide how the EPSD would direct police resources towards Plaintiff HYKEN. She chose, among the options

that LAMARCHE offered her, a course that would result in Plaintiff HYKEN's wrongful arrest. LAMARCHE agreed to this "plan" and proceeded to dispatch Defendant POULIOT who willingly proceeded with same. Defendant VAN GINHOVEN may be held liable for the violation of Plaintiff's rights described herein, because of her personal involvement in and direction of same.

58.     To determine whether the state conspired with a private actor in violation of § 1983 the Sixth Circuit will consider whether there was (1) a single plan; (2) in which each defendant shared a general conspiratorial objective; and (3) the commission of an overt act in furtherance of the conspiracy, causing injury. *Guy v. Lexington-Fayette Urban Cnty. Gov't,* 624 F. App'x 922, 17-18 (6th Cir. 2015). As Described herein, the individual defendants engaged in a concerted, combined effort to deny Plaintiff of his constitutional right to collect evidence of criminal wrongdoing, expose the ineligibility of a candidate for political office, and criticize a political candidate publicly through use of an unlawful and baseless criminal charge. As noted herein, VAN GINHOVEN may be held liable because of her personal involvement in this conspiracy.

59.     In *Monell v. New York City Dept. of Social Services,* 436 US 658, 691 (1978) the Supreme Court concluded that municipal liability under 42 USC § 1983 is limited to deprivations of federally protected rights caused by action taken "pursuant to official municipal policy of some nature."   In *Pembauer v. City of Cincinnati*, 475 US 469 (1986) the Supreme Court clarified *Monell* by holding that when an "ultimate decision maker" in a municipal organization is involved in the deprivation, or when that "action is directed by those who establish government policy" the municipality will be liable for the actions. Defendant LAMARCHE as the Director of Public Safety for the City of Escanaba was the "ultimate decision maker" with

respect to provision of police resources, and the decision whether to forward criminal allegations to the Prosecutor for issuance of warrants and filing of criminal charges. He therefore was the ultimate decision maker behind the decision to arrest Plaintiff and seek prosecution for "stalking." Therefore, Defendant City of Escanaba is vicariously liable for the violation of Plaintiffs' First Amendment Rights, pursuant to 42 U.S.C. § 1983.

60.    Plaintiff has suffered damages, as more fully laid out before, including but not limited to:

    a.    Humiliation, outrage, anger, emotional distress and frustration as a result of Defendant's wrongful actions outlined herein,

    b.    Ongoing loss of his liberty for the period of time between his arrest and eventual dismissal of these baseless charges by the prosecutor, while subject to the pretrial bond order,

    c.    Losses to his character and reputation as a result of the foregoing actions, and

    d.    Attorney's fees and court costs in opposing Defendants' unlawful violation of his rights.

61.    Due to the flagrant, willful, and wanton violation of Plaintiff's rights he is also entitled to an award of punitive and exemplary damages pursuant to applicable law.


### Count II: Malicious Prosecution
**42 USC § 1983**
***As against Defendants Van Ginhoven, LaMarche and Pouliot***

62.    When a § 1983 malicious prosecution claim is premised on a violation of the Fourth Amendment, a plaintiff must show (1) that a criminal prosecution was initiated against him and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that the plaintiff suffered a

deprivation of liberty as a result of the prosecution; and (4) that the prosecution was resolved in his favor. *Sykes v. Anderson*, 625 F.3d 294, 308-309 (6th Cir. 2010). "[T]he fact that [defendant officers] did not make the decision to prosecute does not per se absolve them from liability." *Id.* at 311.

63.    Here, and as noted previously, Plaintiff was criminally prosecuted for "stalking" Defendant VAN GINHOVEN.

64.    There was a lack of probable cause for the criminal prosecution. Plaintiff had a constitutional right to record Defendant VAN GINHOVEN in public. Defendant VAN GINHOVEN knew that his public recording was due to his political objection to her candidacy and she communicated that to Defendant POULIOT who, in turn, documented this statement in a report available to Defendant LAMARCHE. Nevertheless, LAMARCHE "ha[d] a plan" with VAN GINHOVEN to proceed with a criminal prosecution against Plaintiff, and this is what they did.

65.    Defendant LAMARCHE gave VAN GINHOVEN discretion to decide how the EPSD's policing actions towards Plaintiff would be conducted. She chose the option that would result in Plaintiff's arrest and being criminally charged. She therefore influenced the decision to prosecute.

66.    Defendant LAMARCHE agreed to dispatch a Detective to proceed with the "plan" he and VAN GINHOVEN formed to proceed to arrest and charge Plaintiff after a brief interview with VAN GINHOVEN and Plaintiff. He influenced the decision to prosecute.

67.    Defendant POULIOT requested the arrest warrant and criminal charges against Plaintiff by the prosecutor. When he did so, he was aware of this unlawful agreement between

LAMARCHE and VAN GINHOVEN, and the lawful bases for Plaintiff's activities. He influenced the decision to prosecute.

68.    Plaintiff suffered multiple violations of his liberty as a result of the prosecution. He was arrested and jailed on March 28, 2023. He was subjected to a continuous, wrongful prosecution for "stalking." After his arrest, he was continuously, wrongfully subjected to a pretrial bonding order that restricted his movements and prevented him from using social media under the baseless charge was ultimately dismissed. This cost him attorney's fees in defending himself. It caused severe emotional distress.

69.    The prosecution resolved in Plaintiff's favor, when the Prosecutor filed a file a *nolle prosequi* motion on October 17, 2023.

70.    As noted previously, a conspiracy claim under § 1983 requires allegations of: (1) a single plan; (2) in which each defendant shared a general conspiratorial objective; and (3) the commission of an overt act in furtherance of the conspiracy, causing injury. *Guy,* 624 F. App'x 922, *17-18.

71.    Here, Defendants VAN GINHOVEN, LAMARCHE, and POULIOT engaged in a single plan to violate Plaintiff's constitutional right to make public recordings of VAN GINHOVEN for purposes of political opposition and documenting evidence of criminal conduct.

72.    Plaintiff has suffered damages, as more fully laid out herein, including but not limited to:

    a. Humiliation, outrage, anger, emotional distress and frustration as a result of Defendant's wrongful actions outlined herein,

    b. Losses to his character and reputation as a result of the foregoing actions, and

    c. Attorney's fees and court costs in opposing Defendants' unlawful violation of his rights.

73.     Due to the flagrant, willful, and wanton violation of Plaintiff's rights he is entitled to an award of punitive and exemplary damages pursuant to applicable law.

### Count III: Malicious Prosecution
**Common Law of the State of Michigan**
*As Against Defendants Van Ginhoven, LaMarche and Pouliot*

74.     A malicious prosecution claim under Michigan law requires a Plaintiff to prove (1) a defendant began a criminal prosecution against the plaintiff, (2) the criminal proceeding terminated in the plaintiff's favor, (3) the defendant lacked probable cause to begin or maintain the prosecution, and (4) the defendant acted with malice or with a purpose other than bringing the offender to justice. *Matthews v. Blue Cross and Blue Shield of Mich.*, 456 Mich. 365, 378 (1998).

75.     Here, Plaintiff was criminally prosecuted for "stalking" Defendant VAN GINHOVEN. This prosecution was influenced by and unlawful agreement between VAN GINHOVEN and LAMARCHE to proceed with a wrongful prosecution in the absence of probable cause for purposes of stifling his first amendment activity.

76.     There was a lack of probable cause for the criminal prosecution. Plaintiff had a constitutional right to record public officials in public places for political purposes. *McKay v. Federspeil*, 22 F. Supp. 3d 731, 735 (E.D. Mich. 2014) And, he had a constitutional right to record persons in public for purposes of documenting commission of a crime which supersedes any state-law criminal charges that seek to curtail public recording. *Ness v. City of Bloomington*, 11 F.4th 914 (8th Cir. 2021) (holding precisely that).

77.     Plaintiff suffered multiple violations of his liberty as a result of the prosecution. He was arrested and jailed on March 28, 2023. He was subjected to a continuous, wrongful prosecution

until October 17, 2023. During all of this time, he was subjected to a significant deprivation of his liberty in the terms imposed in his pretrial bond order. All of this cost him attorney's fees in defending himself.

78.     The prosecution resolved in Plaintiff's favor on October 17, 2023, when the Prosecutor filed a file a *nolle prosequi* motion.

79.     The elements of a cause of action for civil conspiracy in Michigan are (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose or a lawful purpose by criminal or unlawful means (4) causing damage to the plaintiff. *Fenestra, Inc. v. Gulf Am. Land Corp.*, 377 Mich. 565, 593 (1966); *Mays v. Three Rivers Rubber Corp.*, 135 Mich. App. 42, 48 (1984). In a civil conspiracy, the agreement to do the unlawful act is the thing which must be proved, but "[d]irect proof of agreement is not required . . . nor is it necessary that a formal agreement be proven." *Temborius v. Slatkin*, 157 Mich. App. 587, 600 (1986). Instead, circumstantial evidence can establish the conspiracy. *Id. See also National City Bank v. Syatt Realty Group, Inc.*, No. 07-CV-12438, at *11 (E.D. Mich. Jan. 3, 2011) (citing same with approval)

80.     Here, Defendants VAN GINHOVEN, LAMARCHE and POULIOT engaged in a single plan to subject Plaintiff to arrest and prosecution in order to prevent his continued efforts to document VAN GINHOVEN's perjury in her run for election to the Delta County Commission District 4 seat.

81.     Plaintiff has suffered damages, as more fully laid out before, including but not limited to:

    a.   Humiliation, outrage, anger, emotional distress and frustration as a result of Defendant's wrongful actions outlined herein,

    b.   Losses to his character and reputation as a result of the foregoing actions, and

23

     c.   Attorney's fees and court costs in opposing Defendants' unlawful violation of his

rights.

82.    Due to the flagrant, willful, and wanton violation of Plaintiff's rights he is entitled to an

award of exemplary damages pursuant to applicable law.

### Count IV: Abuse of Process
### Common Law of the State of Michigan
### *As against Defendant Van Ginhoven*

83.    In Michigan, To recover pursuant to a theory of abuse of process, a plaintiff must plead

and prove (1) an ulterior purpose, and (2) an act in the use of process that is improper in the

regular prosecution of the proceeding. *Bonner v. Chicago Title Ins Co.*, 194 Mich. App. 462, 472

(Mich. Ct. App. 1992) The Michigan Court of Appeals has "described a meritorious claim of

abuse of process as a situation where the defendant has used a proper legal procedure for a

purpose collateral to the intended use of that procedure." *Id.* The Court further stated that "there

must be some corroborating act that demonstrates the ulterior purpose."

84.    Defendant VAN GINHOVEN chose to proceed to prosecute Plaintiff for "stalking"

among other options offered her by Defendant LAMARCHE. She did so, knowing full well that

Plaintiff's actions towards her were motivated by his belief that she was ineligible for the office

she had applied for, and his attempts to collect evidence of same.

85.    Defendant VAN GINHOVEN influenced the decision to prosecute Plaintiff for supposed

"stalking."

86.    In so doing, she acted with the improper ulterior purposes frustrating efforts to document

her ineligibility for office and commission of criminal perjury incident to an election, quieting

Plaintiff's ability to make political statements against her on social media, frustrating his ability

to attend public Commission meetings and make statements contrary to her and her agenda, and gaining a political advantage in her campaign for the District 4 Delta County Commissioner seat.

87.     Defendant VAN GINHOVEN's improper ulterior purposes are corroborated by, among other things,

      a.   VAN GINHOVEN's reference to the pending criminal "stalking" charge in her February 9, 2023, social media posting she made in furtherance of her recall campaign against David Moyle,

      b.   VAN GINHOVEN's supporters' subsequent adoption of her talking points about the "stalking" charge by "Moyle's best friend" in support of her recall campaign,

      c.   VAN GINHOVEN's various actions to cause the Court to include a ban on social media contact against Plaintiff, based upon her ongoing, knowing mischaracterizations that his political comments about her were "threatening,"

      d.   VAN GINHOVEN's April 4th attempt to have Plaintiff excluded from attendance at public meetings of the Delta County Commission as part of the pretrial bond order.

      e.   VAN GINHOVEN's spurious April 15th report to EPSD of a "bond violation" because Plaintiff had "not sat as far away from her as he could" at a commission meeting and that he "parked across the street from her" at same, despite her own admission that he had not spoken, approached, or even *looked* at her during the meeting,

      f.   VAN GINHOVEN's attempt to procure a personal protective order, even after the "stalking" charges were *dismissed*, which attempted to extend the prohibition on

Plaintiff's engagement in social media, premised upon her mischaracterization that his political statements about her were "threatening" to her,

g.   In keeping with this theme of prohibiting first amendment conduct by mischaracterizing it as "threats" towards her, VAN GINHOVEN's November 20, 2023 report to the EPSD that Plaintiff had been involved in a "threatening" Youtube video that Plaintiff HYKEN took part in even though, according to the reviewing officer, it did not contain "anything that would be criminal, threatening, intimidating, or harassing."

88.   This was never about "stalking" or safety; this was about quieting a dissenting voice and gaining leverage over a political rival. The "stalking" charge, and the bond order that came with it, prevented Plaintiff from continuing to document VAN GINHOVEN's ineligibility for office and perjury in the election process. VAN GINHOVEN then pressed the advantage she had gained through the charge by using the pretrial bond order to prevent Plaintiff from making statements she did not like about her on social media, as with the Youtube video incident, falsely reporting to law enforcement that his political statements were "threats."   And, she further abused this pending charge to frustrate Plaintiff's right to attend Commission meetings and make statements in support of Moyle and contrary to her political ambitions, as with the nonsensical attempts to hold him in a "bond violation" for "not sitting as far away from her as possible" and parking across the street from her. VAN GINHOVEN acted with the requisite improper ulterior purposes of an abuse of process charge. And, she took numerous corroborating acts in furtherance of this improper purpose.

89.   Plaintiff has suffered damages, as more fully laid out before, including but not limited to:

    a.  Humiliation, outrage, anger, emotional distress and frustration as a result of Defendant's wrongful actions outlined herein,

    b.  Losses to his character and reputation as a result of the foregoing actions, and

    c.  Attorney's fees and court costs in opposing Defendants' unlawful violation of his rights.

90.  Due to the flagrant, willful, and wanton violation of Plaintiff's rights he is entitled to an award of exemplary damages pursuant to applicable law.


**WHEREFORE** Plaintiffs demand the following relief:

1.  INJUNCTIVE RELIEF requiring the Defendants, and each of them, to cease any further violations of Plaintiff's constitutional rights,

2.  COMPENSATORY DAMAGES in an amount determine to be appropriate by the jury,

3.  EXEMPLARY DAMAGES in an amount determined appropriate by the jury,

4.  PUNITIVE DAMAGES in an amount determine appropriate by the jury,

5.  ATTORNEYS FEES and COSTS, pursuant to statute,

6.  Pre and post judgment interest,

7.  Such other relief as this Court may deem appropriate in law or equity.

<strong>PLAINTIFF DEMANDS A JURY TRIAL</strong>

    Respectfully Submitted,

Dated: 3/17/2025

    _Collin Nyeholt_
    Collin H. Nyeholt (P74132)
    Attorney for the Plaintiff

## VERIFICATION OF COMPLAINT

<u>REID HYKEN,</u> being sworn, says:

I verify, under penalty of perjury, that I have read and made this Complaint and attest that those facts stated of my own knowledge are true and those matters stated of which I have been informed I believe to be true after reasonable inquiry.

/s/ _____

Reid Hyken

**Notary Seal**

Subscribed and sworn to by Reid Hyken
before me the 24th day of february , 2025.
Signature Susanne Dubord
Printed Name Susanne Dubord
Notary Public in: Delta County
My Commission Expires October 5, 2028