UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

REID HYKEN,

Plaintiff,

v.

KELLI VAN GINHOVEN, et al.,

Defendants,

and

KELLI VAN GINHOVEN,

Counter-Plaintiff,

v.

REID HYKEN,

Counter-Defendant.
______________________________/

Case No. 2:25-cv-46

Hon. Maarten Vermaat
U.S. Magistrate Judge

**OPINION AND ORDER**

**I. Introduction**

This Opinion and Order addresses the following:

- Reid Hyken's motion for summary judgment as to Kelli Van Ginhoven's counterclaims, ECF No. 67;
- a motion for summary judgment filed by the City of Escanaba ("the City"), the City's Director of Public Safety, Robert LaMarche, and

Detective Sam Pouloit, ECF No. 68; Plaintiff Hyken's response in opposition, ECF No. 73; and the City's corrected reply, ECF 77; and

- Kelli Van Ginhoven's motion for summary judgment, ECF No. 71; and Hyken's response in opposition, ECF No. 74.

We live in a time of strong political division. Candidates and political figures are often under a scrutinizing microscope in both their public and private lives. Even local politics in the small Upper Peninsula community of Escanaba, MI, are no stranger to this reality.

This case centers around the 2022 Escanaba City Commissioner race. Plaintiff Reid Hyken filed a complaint, pursuant to 42 USC § 1983, asserting that Defendants violated his First Amendment right against retaliation and Fourth Amendment right against malicious prosecution during a political dispute in April 2022. ECF No. 1. Hyken also asserts state law claims for malicious prosecution and abuse of process. *Id.* More specifically, Hyken asserts that he suspected that City Commissioner candidate Kelli Van Ginhoven was not residing at the address she claimed, making her ineligible for the elected position. Hyken claims he investigated the address discrepancy, and Van Ginhoven reported Hyken to the police for stalking. Hyken was subsequently charged with stalking, although the charges were later dismissed. Hyken claims that this prosecution was done maliciously and in retaliation for his investigation into Van Ginhoven's residency and his opposition to her candidacy.

Kelli Van Ginhoven filed counterclaims against Hyken for defamation and intentional infliction of emotional distress (IIED). This Court previously granted in part and denied in part Hyken's motion to dismiss Van Ginhoven's counterclaims. ECF No. 61.

The remaining claims are summarized in the table below. However, a bit more explanation is required. First, in Count 1, Hyken alleges that all of the Defendants retaliated against him for First Amendment protected conduct. Count 1 is filed pursuant to 42 U.S.C. § 1983. It includes three variations of retaliation: (1) claims against the individual defendants, (2) a Section 1983 conspiracy claim against the officers and Van Ginhoven, and (3) a retaliation claim against the City. Specifically, Hyken claims that the City is liable because LaMarche was the "ultimate decision maker" as to the stalking charge. ECF No. 1, PageID.18-19 (citing *Pembauer v. City of Cincinnati*, 475 U.S. 469 (1986)). Hyken explains that *Pembauer* was a clarification of the principles of municipal liability under Section 1983 articulated in *Monell v. New York City Dept. of Social Services*, 436 US 658, 691 (1978). ECF No. 1, PageID.18.

Next, in Count 2, Hyken asserts Fourth Amendment malicious prosecution claims under Section 1983 against LaMarche, Pouliot, and Van Ginhoven. Again, Count 2 includes claims against the individual defendants and a Section 1983 conspiracy claim.

In Count 3, Hyken asserts state law malicious prosecution claims against LaMarche, Pouliot, and Van Ginhoven. Count 3 includes claims against the

individual defendants and a civil conspiracy claim against the officers and Van Ginhoven.

In Count 4, Hyken asserts a Michigan state law claim for abuse of process against Kelli Van Ginhoven only.

The following table summarizes the remaining claims and counterclaims:

| **Count** | **Basis** | **Defendants** |
|---|---|---|
| 1 | First Amendment Retaliation, alleging retaliation by individual defendants, a conspiracy to retaliate, and a *Monell* claim against the City | Kelli Van Ginhoven, Robert LaMarche, Sam Pouliot, and the City of Escanaba |
| 2 | Fourth Amendment Malicious Prosecution, alleging claims against the individual defendants and a conspiracy | Kelli Van Ginhoven, Robert LaMarche, and Sam Pouliot |
| 3 | Malicious Prosecution, under Michigan common law, alleging claims against the individual defendants and a conspiracy | Kelli Van Ginhoven, Robert LaMarche, and Sam Pouliot |
| 4 | Abuse of Process, under Michigan common law | Kelli Van Ginhoven |
| Counterclaim 1 | Defamation pertaining to Facebook posts only, Mich. Comp. Law 600.2911(6) | Reid Hyken |
| Counterclaim 2 | IIED pertaining to Facebook posts only, Michigan state law | Reid Hyken |

Defendants LaMarche and Pouliot argue they are entitled to qualified immunity on Hyken's constitutional claims. ECF No. 68. Additionally, the City of Escanaba argues that Hyken's *Monell* claim fails because there is no underlying constitutional violation. *Id.*

Kelli Van Ginhoven argues that she is entitled to summary judgment because she was not involved in a coordinated effort to deprive Hyken of any rights and she did not have the authority to authorize charges. ECF No. 71, PageID.784.

In response, Hyken maintains that he engaged in constitutionally protected activity within the safe harbor provision of the Michigan stalking statute. Furthermore, he argues the Defendants engaged in a plan to charge him with stalking.

Ultimately, the key issues in this case are (1) whether Hyken has shown that he had a clearly established right to repeatedly drive by Van Ginhoven's cupcake shop / residence, take photographs from the alleyway, and, on one occasion, shout obscenities at her, and (2) whether probable cause existed to support a stalking charge under Michigan law.

For the reasons stated below, the Court rules (1) that Hyken did not have a clearly established right to engage in such conduct, and (2) that probable cause existed to support a stalking charge under Michigan law. Accordingly, Defendants' motions for summary judgment are GRANTED, the Court declines to exercise supplemental jurisdiction over Van Ginhoven's state law claims, and this case is DISMISSED.

## II. Factual Allegations

This Court issued an Opinion and Order addressing Hyken's prior motion to dismiss. There, the Court provided the following summary of the factual allegations:

> In his Complaint, Hyken asserts that Defendant Van Ginhoven ran for the Delta County Board of Commissioners during the 2022 election cycle. ECF No. 1, PageID.3. The position Ms. Van Ginhoven sought was held by David Moyle, whom Hyken supported as a candidate and County Commissioner. *Id.* Hyken states that to be eligible for the Commissioner seat, a candidate is required to reside in the City of Escanaba for not less than 30 days prior to filing as a candidate. *Id.*, PageID.4. Hyken alleges that Van Ginhoven's primary residence in 2022 was a home in Bark River, MI, outside of the City of Escanaba limits. *Id.* However, Van Ginhoven owned a business called "For the Love of Cupcakes" in downtown Escanaba. *Id.* Hyken asserts that Van Ginhoven changed the address on her driver's license to the business address prior to filing her candidacy. *Id.*
>
> Hyken states that he owned a business not far from Van Ginhoven's cupcake business. Hyken says that this allowed him to observe that Van Ginhoven was not present at the cupcake shop in the evenings and that it did not appear to truly be her primary residence. *Id.*
>
> Hyken claims that he reported Van Ginhoven to the Michigan State Police ("MSP") for election fraud on July 7, 2022. *Id.*, PageID.5. Hyken asserts that the report led MSP Trooper Povich to visit Van Ginhoven's cupcake shop to discuss her permanent residence. Hyken states that Van Ginhoven told Trooper Povich that she had "been living in the apartment with one daughter while her husband gets their house ready to sell and "they plan on building in Escanaba." *Id.*
>
> Next, Hyken asserts that he "continued to collect evidence to support his assertion that Van Ginhoven was not maintaining a permanent residence in the cupcake shop in Escanaba." *Id.* Hyken says he would drive by the building in the evening and take pictures of the building's exterior. *Id.* This led to Van Ginhoven's husband calling Escanaba Public Safety Department on August 23, 2022. *Id.* Hyken asserts that Van Ginhoven was able to "garner influence" with Defendant Officer LaMarche. *Id.*, PageID.6. Hyken states that Officer LaMarche assisted Van Ginhoven in filing a formal complaint against Hyken. *Id.* Defendant

Detective Pouliot filed a report on August 25, 2022, detailing Escanaba Police Department's investigation of the complaint. *Id.*, PageID.8. Hyken asserts that Detective Pouliot also submitted a warrant request against Hyken for stalking in violation of Mich. Comp. Law 750.411h.

Hyken states that Van Ginhoven lost the election in November 2022, and Mr. Moyle retained his role on the Delta County Board of Commissioners. *Id.*, PageID.9. However, the story did not end there. On February 7, 2023, the Board of Commissioners voted to terminate the County Administrator. *Id.*, PageID.10. Hyken says he sent a letter to the local newspaper expressing his support for the Board's decision. *Id.* Hyken alleges that in response to his newspaper article, Van Ginhoven posted discrediting comments about Hyken on Facebook, including the following:

> [d]uring my campaign, this man on a nightly basis, drove thru the alley where I live taking photos of my apartment. Nightly. For months. Just rolling through the alley with his window down, taking photos of my place of residence. I have video to prove it. He refused to stop, even when my husband and law enforcement got involved. Even my neighbors next door had enough of him. He told law enforcement he was "doing research."

*Id.*

Hyken states that he was arrested and charged with stalking on March 28, 2023. *Id.*, PageID.11. One of the conditions of bond was for Hyken to not have "any social media access to any social media whatsoever." *Id.* Hyken says that Van Ginhoven personally advocated for this condition. Furthermore, Hyken asserts that Van Ginhoven "proceeded to aggressively abuse the bond order" by reporting Hyken to police for alleged Facebook use. *Id.* Hyken claims that Van Ginhoven also attempted to misuse the pretrial bond order to restrict Hyken from attending public meetings. *Id.*, PageID.12.

Hyken claims that Van Ginhoven used the pending stalking charges to her political advantage in an attempt to recall Moyle from the Board of Commissioners. *Id.*, PageID.13. Hyken says that the charges were eventually dismissed on October 17, 2023. *Id.* However, Hyken asserts that Van Ginhoven continued to pursue a Personal Protection Order (PPO) against him. *Id.* Hyken says the PPO request was denied on December 5, 2023. *Id.*, PageID.14.

Van Ginhoven filed her Counterclaim on Oct. 15, 2025. The Counterclaim includes just over three pages of factual allegations that comprise the bases for Van Ginhoven's Counterclaim. Paragraphs 10 through 20 outline claims that Hyken included in his Complaint that Van Ginhoven now claims are false. ECF No. 30, PageID.181-83. In Paragraph 9, Van Ginhoven also alleges that Hyken's social media posts were false and defamatory. That paragraph is shown below.

> 9. That attached to this Counter-Complaint are various social media posts by the Plaintiff/Counter-Defendant, that have been disseminated to the public and in said social media posts he indicates that Defendant/Counter-Plaintiff was "napping" around, meaning sleeping around, when said statement is untrue, false, and defamatory, and also caused her infliction of emotional distress.

*Id.*, PageID.181.

Van Ginhoven also includes two attachments depicting what appear to be social media posts made by Hyken. ECF Nos. 30-1 and 30-2. The following post – a response to AE Worth – appears to be the basis for Van Ginhoven's claim in Paragraph 9:

> Reid Hyken Author
> AE Worth Like someone running for office would... seen anything from cupcake outer than tantrums about not getting her way?
>
> When she was finally allowed on the board after napping around town she lived up to the name of the organization.... DDA Didn't Do Anything.
>
> At least those initials mean something. How about yours J.O.

ECF No. 30-1, PageID.190.

Van Ginhoven's Counterclaim includes an allegation that Hyken published his remarks to third parties "with knowledge of the falsity of the statements or in reckless disregard for their truth or falsity." ECF No. 30, PageID.184.

> Van Ginhoven alleges that because of Hyken's actions, her reputation was tarnished and she experienced emotional and physical distress. *Id.*, PageID.183.

In addition to the factual allegations detailed above, police reports provide the following undisputed timeline in this case.

First, on July 7, 2022, the Michigan State Police (MSP) opened an original incident report to investigate an election fraud complaint that Kelli Van Ginhoven was residing outside of the district where she filed to run in. ECF No. 68-2, PageID.726 (MSP Report). Plaintiff Hyken identifies himself as the person who reported Van Ginhoven to the MSP for election fraud. ECF No. 1, PageID.5; ECF NO. 73, PageID.798 (Hyken's response brief). As shown in the portion of the police report below, MSP investigated the election fraud complaint and determined the complaint was unfounded on July 29, 2022. *Id.*, PageID.729.

| | | |
|---|---|---|
| **MICHIGAN DEPARTMENT OF STATE POLICE** | **ORIGINAL DATE:** Thu, Jul 07, 2022 | **INCIDENT NO:** 084-0000990-22 |
| **SUPPLEMENTAL INCIDENT REPORT** **0001** | **SUPPLEMENTARY DATE:** Fri, Jul 29, 2022 | **FILE CLASS:** 59000 |

**CONTACT VAN GINHOVEN:**

I went to Van Ginhoven's listed address on 7/20/2022. She was at the apartment at approximately 8:30pm. She said she has been living in the apartment with one daughter while her husband gets their house in [redacted] ready to sell. They plan on building a house in Escanaba. Kelli showed me around the apartment and it was apparent she was living there. It was fully furnished, and had family photo's around the apartment. The kitchen had food and cookware, and the bedrooms and livings areas were set up. There was nothing to indicate that the apartment was not her primary residence.

**STATUS:**

UNFOUNDED

*Id.*

Nearly a month later, on August 23, 2022, Kelli Van Ginhoven emailed Director Robert LaMarche with concerns about Hyken driving through her alleyway and taking photos. ECF No. 68-6, PageID.744. She reported that she had seven

videos of Hyken driving through her alley, taking photographs on some occasions, and in possession of binoculars. *Id.* She also reported that Hyken had said "fuck you" and "blow me" to her. *Id.*

As shown in the email below, Director LaMarche explained relevant options, *id.*, PageID.743-44, and Van Ginhoven elected to proceed with reporting her concerns to a detective. *Id.*, PageID.743.

Hi Kelly

There area few options we can take.

1. I can have an officer stop by and you can file a formal complaint. Our officer would then make contact and have a chat with him laying out your concerns. Depending on how the conversation goes it may stop him or he may increase his behavior. The report would then be documented with the officer's findings. You could then get the report and attempt to get a Personal Protection Order from the courts to stop his behavior.

2. I can have an officer stop by as in Option 1. Upon the conclusion of the investigation the officer can submit a warrant for stalking. The prosecutor would review the case and would either authorize or deny the warrant.
3. You can make a report, and we do not make contact with him. However, in light of the recent events and his response to you I don't think this is a very good option.
4. You continue to document his behavior like you have and a report is not made.

ECF No. 68-4, PageID.735-36.

That same day, Van Ginhoven responded to LaMarche, stating that she "would like to proceed with option 2 please." ECF No. 68-6, PageID.743. LaMarche responded by saying, "[s]ounds like a plan. I will be sending down a detective to talk to you today." *Id.*

On August 25, 2022, Director LaMarche referred the case to Detective Pouliot. ECF No. 68-6, PageID.743.

That same day, August 25, Detective Pouliot spoke with Van Ginhoven, who reported that Hyken drove through her alley and took pictures on August 12th, 16th,

and 22nd. *Id.*, PageID.744-45. Van Ginhoven provided the detective with videos showing Hyken driving through the alley behind her residence on numerous occasions between August 16 and August 22. *Id.*, PageID.745. Van Ginhoven also described a verbal exchange she had had with Hyken, in which she said "Hi Reid" and he replied "fuck you." And when she said "have a nice night", he replied "blow me." *Id.* Hyken confirmed the first part of this exchange in his deposition. ECF No. 68-1, PageID.517.

Detective Pouliot also spoke with witnesses who said they saw Hyken in the alley. ECF No. 68-6, PageID.745-46. One of the witnesses, Joe Kaplan, reported seeing Hyken "slow roll" through the alley twice. *Id.*, PageID.745. Kaplan said he followed Hyken for about 40 minutes afterwards. *Id.*

Pouliot's report also documents his interview with Plaintiff Hyken on August 25. In his report, Detective Pouliot noted that Hyken admitted to taking pictures of Van Ginhoven's apartment and claimed he was investigating Van Ginhoven's residency status for the upcoming election. *Id.*, PageID.746. Hyken stated that as he understood, the state police were investigating where she resided and he "wanted more evidence, in case the state police did not conduct a full investigation." *Id.* Detective Pouliot subsequently submitted a warrant request on Reid Hyken for stalking in violation of Mich. Comp. Laws § 750.411h. *Id.*, PageID.747.

On August 26, 2022, Van Ginhoven sent Detective Pouliot a video of Hyken's black Hummer in her alley again. *Id.* Detective Pouliot noted the incident in a

supplemental report and stated he would forward the video to the Prosecutor for review. *Id.*

On August 29, 2022, as detailed in a portion of the report shown below, Detective Pouliot reached out to MSP and confirmed the investigation into Kelli Van Ginhoven's residency was documented as "unfounded" and closed on July 29, 2022. *Id.*, PageID.748. Pouliot referenced the MSP report in his own investigation, as shown below.

> 08-29-22
>
> **ADDITIONAL INFORMATION:**
> On the date above, I reached out to Sgt Janisse at the MSP Gladstone Post to inquire if their was an open investigation into the residency status of Kelli van Ginhoven. Sgt Jannise found a investigation on 07-29-22, that was documented to be "unfounded" . The reporting officer was Trooper Povich and the nature of the complaint was Election Fraud. In summary, the complainant on the report was a Josh McKenna who reported on 07-07-22, that Kelli van Ginhoven was not residing in the district that she filed to run in. Trooper Povich gathered background information and made contact at Kelli van Ginhoven's residence at 805 Ludington St. Trooper Povich reported that there was nothing to indicate that the apartment was not her primary residence. Sgt Janisse emailed the report to me and the report was attached to the case and forwarded to the Prosecutor.
>
> *End of supplement*
>
> *Det. Pouliot 42*
> *Escanaba Public Safety*

*Id.*[1]

Detective Pouliot's report notes that the MSP report on its investigation of alleged election fraud by Van Ginhoven was also sent to the Prosecutor. *Id.*

One month later, on <u>September 29, 2022</u>, Detective Pouliot received another email from Van Ginhoven stating that Hyken drove in the alley behind her business and apartment again. *Id.*, PageID.748. Van Ginhoven included two screenshots of

1 In Hyken's motion for summary judgment, he asserts that he reported speculations that Van Ginhoven misrepresented her residence to Michigan State Police. ECF No. 67, PageID.398. The complainant's name on the MSP report is redacted so the undersigned cannot verify who made the complaint to MSP.

a black Hummer in the alley. Detective Pouliot sent the screenshots to the Prosecutor. *Id.* Pouliot reported this contact in his Supplement 4, dated October 24, 2022. ECF No. 68-6, PageID.748. A review of this collection of reports and Pouliot's Affidavit, ECF No. 68-5, indicates that his involvement in the case ended at that point. The record does not include a transcript of a deposition with Pouliot.

Similarly, based on the record before the Court, Director LaMarche's direct involvement in the Hyken investigation ended on or about August 23, 2022, after he referred the matter to Det. Pouliot. ECF No. 68-6, PageID.744, ECF No. 68-3 (Affidavit of LaMarche). The record does not include a transcript of a deposition with LaMarche.

Next, the police report details that on March 28, 2023, the Menominee County Prosecutor's Office approved a warrant for Reid Hyken for stalking. *Id.*, PageID.749. Later that day, Lt. Lafave and Sgt. Sovey executed the warrant and arrested Hyken. *Id.* The following sections from the police report detail the arrest warrant and subsequent arrest:

**ARREST WARRANT:**

A warrant for stalking was approved by the Menominee County Prosecutors Office for Reid Hyken. It was emailed to Escanaba Public Safety on todays date, 3/28/23. After receiving it, I brought this warrant to the Delta County District Court Office to have the warrant sworn out. The warrant was sworn out with magistrate LaCarte. For the warrant information and bond conditions, see the attached copies.

**ARREST:**

At approximately 230pm Sgt Sovey and I made contact with Hyken at his shop on Ludington Street. The warrant was explained, along with the bond conditions. He was given copies of both. He was advised that he was under arrest and was cooperative. We escorted him to Sgt Sovey's patrol car. Sgt Sovey transported Hyken to the Sheriff's Office were he was lodged.

*Id.*

A misdemeanor complaint was subsequently issued against Reid Hyken for stalking. The following is the count charged in the criminal complaint:

STATE OF MICHIGAN, COUNTY OF DELTA.
The complaining witness says that on the date and at the location described, the defendant, contrary to law,

COUNT 1: STALKING
did engage in a willful course of conduct involving repeated or continuing harassment of [redacted], the conduct being such that would cause a reasonable person to feel terrorized, or frightened, or intimidated, or threatened, or harassed, and such conduct did cause [redacted] to feel terrorized, or frightened, or intimidated, or threatened, or harassed; contrary to MCL 750.411h. [750.411H]
MISDEMEANOR: 1 Year and/or $1,000.00; up to 5 years probation

*Id.*, PageID.756.

Hyken was released on bond on March 28, 2023. The bond conditions included a curfew of 9:00PM – 6:00AM, no access to social media, and no contact with Kelli Van Ginhoven. *Id.*, PageID.761.

On October 11, 2023, Prosecutor Rogg issued an Order of Nolle Prosequi dismissing the stalking charge against Reid Hyken. ECF No. 68-10, PageID.763. The reason listed on the Nolle is "case to be recharged as Felony," but no new charge was issued. *Id.*[2]

**III. Rule 56(c) Materials Submitted by the Parties**

The parties submitted extensive materials for the Court's review. They are listed below.

**A. Materials Submitted by the City, Director LaMarche, and Det. Pouliot**

1. Transcript of Reid Hyken's entire deposition, ECF No. 68-1,

[2] It should be noted that on June 7, 2023, four months prior to the dismissal, the U.S. Supreme Court issued *Counterman v. Colorado*, 600 U.S. 66 (2023). *Counterman* changed the standard to criminally prosecute a defendant for stalking based on true threats.

2. Michigan State Police Report pertaining to Kelli Van Gin Hoven's residence authored by Trooper Josiah Povich, ECF No. 68-2,
3. Affidavit of Escanaba Department of Public Safety Director Robert LaMarche, ECF No. 68-3,
4. Email chain between LaMarche and Van Ginhoven discussing options to proceed with a stalking complaint against Hyken, ECF No. 68-4,
5. Affidavit of Detective Sam Pouliot, ECF No. 68-5,
6. Escanaba Public Safety Department Report concerning Van Ginhoven's stalking complaint against Hyken, ECF No. 68-6,
7. Affidavit of Menominee County Prosecutor Jeffrey Rogg, ECF No. 68-7,
8. Misdemeanor Criminal Complaint against Reid Hyken, ECF No. 68-8,
9. Pre-Trial Release Order and Bond Conditions for Reid Hyken, ECF No. 68-9,
10. Motion and Order of Nolle Prosequi of stalking complaint against Reid Hyken, ECF No. 68-10, and
11. Kelli Van Ginhoven's Petition for a Personal Protection Order against Reid Hyken, ECF No. 68-11.

**B. Hyken's Responsive Materials**

1. September/October 2022 email conversation between Kelli Van Ginhoven and Detective Pouliot concerning additional videos, ECF Nos. 73-2, 73-16,

2. March 26, 2023, email from Kelli Van Ginhoven to Prosecutor Jeffrey Rogg with a social media post by Reid Hyken attached, ECF Nos. 73-3, 73-8, and 73-13,
3. August 2024 email conversation between Kelli Van Ginhoven and Prosecutor Jeffrey Rogg, ECF No. 73-4,
4. Grievance filed by Kelli Van Ginhoven against Prosecutor Jeffrey Rogg, ECF No. 73-5,
5. Escanaba Public Safety Department Report of a Possible Bond Violation by Reid Hyken on April 15, 2023, ECF No. 73-6,
6. Escanaba Public Safety Department Report of a Possible Bond Violation by Reid Hyken on April 1, 2023, ECF No. 73-7,
7. March 27, 2023, email from Prosecutor Jeffrey Rogg to Kelli Van Ginhoven with proposed facts in support of a stalking charge against Reid Hyken, ECF No. 73-9,
8. July/August 2023, emails from Kelli Van Ginhoven to Prosecutor Jeffrey Rogg regarding a possible plea, ECF No. 73-10,
9. April 3, 2024, email conversation between Kelli Van Ginhoven and Prosecutor Jeffrey Rogg regarding Reid Hyken's social media use, ECF No. 73-11,
10. February 28, 2023, email from Kelli Van Ginhoven to Prosecutor Jeffrey Rogg with Hyken's Daily Press Letter to the Editor attached, ECF No. 73-12,

11. March 23, 2023, email from Kelli Van Ginhoven to Prosecutor Jeffrey Rogg regarding the Hyken case evidence and no contact order, ECF No. 73-14,
12. August 23, 2022, email conversation between Kelli Van Ginhoven and Director LaMarche concerning updates on the Hyken stalking complaint, ECF No. 73-15,
13. February 28, 2023, email from Kelli Van Ginhoven to Prosecutor Jeffrey Rogg with a social media post by Reid Hyken attached, ECF No. 73-17
14. December 2022, email conversation between Kelli Van Ginhoven, City Manager James McNeil, and City Clerk Phil DeMay regarding residency requirements to run for Council, ECF No. 73-18,
15. January 19, 2024, email from Kelli Van Ginhoven to Prosecutor Jeffrey Rogg regarding a PPO hearing, ECF No. 73-19,
16. January 22, 2024, email conversation between Prosecutor Rogg and Defense Attorney Scott Graham regarding a PPO and possible felony charge, ECF No. 73-20,
17. Various news articles about the Delta County Commissioners, ECF No. 73-21,
18. September 22, 2025, email from Tammy Chaillier with a memo from the Menominee County Prosecutor's Office denying criminal charges for Reid Hyken attached, ECF No. 73-22,
19. Facebook messages between Kelli Van Ginhoven and Valine Kobasic, ECF No. 73-23,

20. Facebook post by Kelli Van Ginhoven, ECF No. 73-24,

21. Text messages between Jeff Rogg and Kelli Van Ginhoven, ECF No. 73-25,

22. February 8, 2023, email conversation between Kelli Van Ginhoven and Planning and Zoning Administrator Tyler Anothy concerning February 7, 2023 County Commissioners meeting, ECF No. 73-26.

**C. Kelli Van Ginhoven's Rule 56(c) Materials**

1. Affidavit of Kelli Van Ginhoven, ECF No. 71-1.

**D. Reid Hyken's Rule 56(c) Materials in Support of His Motion for Summary Judgment on Kelli Van Ginhoven's Counterclaims**

1. June 3, 2026, The Mining Journal article on Kelli Van Ginhoven running for state senate, ECF No. 67-2,

2. April 25, 2019, City of Escanaba City Council Meeting Proceedings, ECF No. 67-3,

3. January 16, 2026, email from Collin Nyeholt to Derek Swajanen and Gregory Grant with Plaintiff's second discovery to Van Ginhoven attached, ECF No. 67-4,

4. Affidavit of Reid Hyken and July 14, 2022, social media messages on "Escanaba Area Rants & Raves" Facebook page, ECF No. 67-5.

**IV. Motion For Summary Judgment Standard**

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether

summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251−52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

**V. Analysis**

Defendants LaMarche and Pouliot argue they are entitled to qualified immunity on Hyken's First Amendment and Fourth Amendment claims against them.

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Analyzing claims of qualified immunity involves a two-pronged test. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these prongs in either order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if the court finds that there is no constitutional violation, or that the right at issue was not clearly established. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first prong of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second prong. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, **but existing precedent must have placed the statutory or constitutional question beyond debate**." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (cleaned up, emphasis added) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). In other words:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority"

> or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd*, supra, at 741–742, 563 U.S. 731, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S. at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. 7, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, supra, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, supra, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix*, supra, at 309 (quoting *Anderson*, supra, at 640–641, 107 S.Ct. 3034; some alterations in original).

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

The two main issues in this case are: (1) whether Hyken has shown that he had a clearly established right to engaged in the conduct at issue here – repeatedly driving by Van Ginhoven's cupcake shop / residence, taking photographs from the alleyway, and, on one occasion, shouting obscenities at her, and (2) whether there was probable cause to charge Hyken with stalking charge under Michigan law.

### A. Clearly Established Right

The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Mulcahey v. Township of Chocolay, Michigan*, Case No. 25-1396, 2026 WL 64236 at *7 (6th Cir. Jan. 8, 2026) (quoting *D.C. v. Wesby*, 583 U.S. 48, 63-64 (2018)). Rather, a "rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

Hyken argues that his political criticisms of Van Ginhoven on social media and his information gathering from a public street behind Van Ginhoven's apartment were protected by the First Amendment. ECF No. 73, PageID.823. Specifically, Hyken asserts that "the right to criticize public officials is clearly established under the first amendment." *Id.* Additionally, he claims that "even a cursory read of the statute would have told all involved that Hyken's *constitutionally protected* conduct *could not* amount to a violation of the statute." *Id.*, PageID.801 (italics in original). And, in his Complaint, Hyken asserts that "[o]nly the most incompetent of state officials would be unaware of these rights." ECF No. 1, PageID.16.

Mich. Comp. Laws § 750.411h(1) defines stalking under Michigan law. With emphasis added, the statute includes the following relevant provisions:

> (a) **"Course of conduct"** means a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose.

(…)

(d) **"Harassment"** means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress. **Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose.** [3]

(e) **"Stalking"** means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

(f) **"Unconsented contact"** means any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:
(i) Following or appearing within the sight of that individual.
(ii) Approaching or confronting that individual in a public place or on private property.
(iii) Appearing at that individual's workplace or residence.
(iv) Entering onto or remaining on property owned, leased, or occupied by that individual.
(v) Contacting that individual by telephone.
(vi) Sending mail or electronic communications to that individual.
(vii) Placing an object on, or delivering an object to, property owned, leased, or occupied by that individual.

Notably, this statute does not require a showing of fear. *Hayford v. Hayford*, 279 Mich. App. 324, 331 (2008).

Furthermore, in *Nastal v. Henderson & Assocs. Investigations, Inc.*, the Michigan Supreme Court provided guidance on the scope of the safe harbor provision in the stalking statute. In that case, the plaintiff alleged that he was being

[3] The highlighted portion is the so-called "safe harbor provision."

unlawfully stalked by a private investigator. *Nastal*, 471 Mich. 712, 714, (2005). The Court considered if, and when, such surveillance would fall within the safe harbor in the stalking statute, then Section 750.411h(1)(c). *Id.* The Court concluded that, "given the plain and ordinary import of the terms used by the Legislature . . . the phrase 'conduct that serves a legitimate purpose' means conduct that contributes to a valid purpose that would otherwise be within the law irrespective of the criminal stalking statute." *Id*. at 723. In *Nastal*, the Court held that surveillance by licensed private investigators fell within the safe harbor provision. *Id*. at 724.

Hyken argues that his actions fall into this "safe harbor provision."

As noted above, the clearly established standard requires that the legal principle clearly prohibits the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Katz*, 533 U.S. at 202. This requires a high "degree of specificity." *Mullenix,* 136 S.Ct. at 309.

Here, the particular circumstances are that on August 23, 2022, Kelli Van Ginhoven contacted Director LaMarche to complain about Hyken's alleged stalking behavior, including driving by her residence on numerous occasions and, on one occasion, shouting profanities at her. ECF No. 68-3 (Affidavit of LaMarche), ECF No. 68-6, PageID.744 (Van Ginhoven email to LaMarche), ECF No. 71-1 (Affidavit of Van Ginhoven). Director LaMarche referred her complaint to Det. Pouliot on

August 25, 2022. ECF No. 68-6, PageID.743, ECF No. 68-3, ECF No. 68-5 (Affidavit of Pouliot).

That same day, Det. Pouliot investigated the complaint by questioning Kelli Van Ginhoven, Reid Hyken, and two witness neighbors. ECF No. 68-6, PageID.744-47. During this interview, Hyken admitted that he was driving past Van Ginhoven's shop, taking pictures of the shop, and, on one occasion, yelling obscenities at her. *Id.*, PageID.746. Hyken also said he knew that MSP was investigating her residence. *Id.*

Hyken was questioned on these activities during his deposition. ECF No. 68-1. He said that he drove by her shop "[e]very day, every other day", "periodically" and "many times a week." *Id.*, PageID.497.

In her affidavit, Van Ginhoven stated that Hyken drove by her residence, took pictures, and yelled profanities at her. ECF No. 71-1. She said that "he was simply not letting up with his behavior." *Id.* When speaking with Det. Pouliot, Van Ginhoven said she felt intimidated and harassed by Hyken. ECF No. 68-6, PageID.745. Van Ginhoven's husband also called 9-1-1 to report Hyken's activities. *Id.*

Hyken told Det. Pouliot about the MSP investigation into Van Ginhoven's residence. ECF No. 68-6, PageID.746. Hyken said that he wanted more evidence in case the MSP did not conduct a full investigation. *Id.*

Pouliot made his warrant request to the prosecutor after completing these steps of his investigation. *Id.*, PageID.747.

A few days later, on August 29, 2022, Det. Pouliot discovered that MSP had determined, over a month earlier, that Hyken's election fraud allegations against Van Ginhoven had been investigated and determined to be "unfounded." *Id.*, PageID.748, *see also* ECF No. 68-2, PageID.729 (MSP report). Pouliot forward the MSP report to the prosecutor. ECF No. 68-6, PageID.748.

Pouliot's last involvement with the case appears to have occurred on October 24, 2022, when he wrote Supplement 4 to his original report. *Id.*, PageID.748.

Prosecuting Attorney Jeffrey Rogg, who was serving as the Menominee County prosecutor, was appointed to serve as special prosecutor for the warrant request for the stalking charges in Delta County, where Escanaba is located. ECF No. 68-7. Rogg states that he "believed there was sufficient evidence to support a conviction for misdemeanor stalking and [he] used his independent discretion to charge Mr. Hyken with stalking." *Id.* Rogg authorized the warrant for Hyken's arrest on March 28, 2023. ECF No. 68-8. Lt. Lafave signed the misdemeanor complaint as the complaining witness that same day. *Id.*

Plaintiff Hyken does not dispute this timeline of the investigation or the essential facts, nor does he submit deposition transcripts for Pouliot, LaMarche, or Van Ginhoven. Hyken presents his case as though he had a self-evident right to photograph Kelli Van Ginhoven in her home and yell obscenities at her window. As he explains, "[e]ven a cursory read of the statue would have told all involved that Hyken's constitutionally protected conduct could not amount to a violation of the

statute." ECF No. 73, PageID.801. The core of Hyken's argument is set forth as follows:

> Hyken was occupying a public street and photographing the exterior of Van Ginhoven's supposed residence while it was not occupied. He did this for purposes of proving that she had falsely represented it to be her "primary residence" as part of her run for local office. Hyken was engaged in constitutionally protected information gathering.

*Id.*, PageID.813.

Hyken primarily relies on two cases to support his assertion that he had a clearly established right to engage in the activity that Pouliot relied on for the stalking charge.[4] First, Hyken cites to the Sixth Circuit's 1998 decision *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998). In *Bloch*, a rape victim criticized the sheriff's department handling of her case in local news articles. In response, the sheriff released "personal and extremely humiliating details" of the rape. The Sixth Circuit determined that the sheriff was not entitled to qualified immunity because:

> "the right to criticize public officials is clearly established, the Blochs have alleged that they suffered embarrassment and humiliation that would chill people of ordinary firmness from continuing to exercise their constitutional rights as a result, and they claim that the release of the highly personal information was motivated at least in part as a response to the exercise of those rights."

*Id.* at 683.

---

[4] In addition to the two cases Hyken focuses on in his response brief, he also cites several cases in the footnotes to support his assertion that he had a clearly established right to "collect information" from the alleyway behind Van Ginhoven's residence. ECF No. 73, PageID.813, n. 115-118. The cases regard the constitutional right for non-journalist members of the public to gather information on public property. None of the cases Hyken offers are analogous to repeatedly photographing an individual's home and shouting obscenities.

Next, Hyken relies on the Eighth Circuit's decision in *Ness v. City of Bloomington*, 11 F. 4th 914 (8th Cir. 2021). There, Sally Ness, a Bloomington, Minnesota resident, insisted on taking pictures and videos of a city park to document concerns about the park on Facebook. *Id.* at 918. Bloomington police received complaints about Ness's behavior. *Id.* at 919. Two Bloomington police officers warned Ness that she could be arrested for violating the Minnesota harassment statute. *Id.* Ness alleged that the City and the officers violated her First and Fourteenth Amendment rights. *Id.* The Eighth Circuit concluded that the officers were entitled to qualified immunity because they reasonably relied on the state statute. *Id.* at 921-22. However, the Court of Appeals also determined that a local city ordinance restricting photography of children without consent was unconstitutional under the First Amendment as applied to Ness's activity. *Id.* at 924. The Court explained that photographs and video recordings are "an important stage of the speech process that ends with the dissemination of information about a public controversy." *Id.* at 923.

But these cases are not analogous to the situation in this case.

Here, the Court is required to consider Hyken's rights in <u>the circumstances that LaMarche and Pouliot confronted</u>. *Wesby*, 583 U.S. 583 at 63 (stating (1) that the "clearly established" standard requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him, and (2) that the rule's contours must be so well defined that it is "clear to a reasonable officer that his

conduct was unlawful in the situation he confronted") (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001)).

The key components of the situation faced by LaMarche in August 2022 and Pouliot in August and September 2022 are:

(1) Hyken repeatedly drove by Van Ginhoven's cupcake shop, which, as she states, was also her residence, resulting in repeated and unconsented contact with Van Ginhoven,

(2) Hyken repeatedly took photographs of her residence while she was in it,

(3) Hyken yelled profanities at her when she confronted him,

(4) Hyken's proffered explanation – that he was investigating to determine whether Van Ginhoven met the residency requirements for the elective office she was pursuing – was undercut by an MSP investigation, completed in July 2022, that concluded that Hyken's suspicions about her residency status were unfounded.

Thus, Hyken repeatedly photographed Van Ginhoven's *home* after an MSP investigation determined that Hyken's election fraud allegations against Van Ginhoven were unfounded. In his deposition, Hyken stated that he continued to photograph Van Ginhoven's apartment after he was told she resided there.

Q Okay. You continued, even after you were told that she resided there and that MSP concluded that she resided there and she hadn't been charged, and you indicated to Defendant Pouliot that, "Yeah, I'm taking pictures. Taking pictures of a vacant apartment at night because the law says she has to live there more than half the time"; true?
A Yes.

ECF No. 68-1, PageID.633 (Deposition of Reid Hyken).

To overcome LaMarche's and Pouliot's qualified immunity defense, Hyken has the burden of showing that his right to engage in this conduct *under these circumstances* was clearly established. He has not met this burden. Hyken has not proffered any case law (or any reasonable explanation) that would support the conclusion (1) that Hyken had a clearly established right that triggered the safe harbor provision of the stalking statute, and (2) that law enforcement officers in the circumstances faced by LaMarche and Pouliot in August 2022 were obligated to drop their investigation. Thus, Hyken's stalking-related behavior does not qualify under Michigan's stalking law "safe harbor" provision. Accordingly, Hyken has provided no legal authority that supports his argument that Pouliot and LaMarche are not entitled to qualified immunity.

One case that *is* analogous here is *Mulcahey v. Twp. of Chocolay, Michigan*, No. 25-1396, 2026 WL 64236 (6th Cir. Jan. 8, 2026). In *Mulcahey*, Plaintiff Deborah Mulcahey's neighbor complained that Mulcahey was stalking her. *Id.* at *1. Chocolay Township police officers prepared two reports documenting the complaints and photographic evidence. *Id.* One police officer submitted a misdemeanor

complaint attesting that Mulcahey violated Michigan's stalking law. *Id.* Subsequently, a judge issued a warrant for Mulcahey's arrest. *Id.* Mulcahey was charged under Michigan's stalking statue – the same charge brought against Reid Hyken. *Id.* The charges were eventually dismissed and Mulcahey asserted claims against the complainant, Chocolay Township, and several township employees and police officers in federal court. *Id.* Mulcahey argued that her conduct fell within the safe harbor provision of the Michigan stalking statute. *Id.* at *3.

The district court determined that the police officers were entitled to qualified immunity, dismissed the federal claims, and declined to exercise supplemental jurisdiction over the state law claims. *Id.* at *2. The Sixth Circuit Court of Appeals affirmed the district court's dismissal. *Id.* at *5. Notably, the Sixth Circuit concluded that Mulcahey failed to identify a single case that supported her assertion that the officers violated a clearly established right. *Id.* at *4.

Just as in *Mulcahey*, Hyken's argument that the safe harbor provision applies comes up short. While Hyken had a right to criticize Van Ginhoven as a public official running for office, he had no clearly established right to conduct surveillance of Van Ginhoven's private residence, and to yell profanities at after, purportedly for the purpose of investigating her residency status *after* the MSP investigated his residency concerns and found them to be unfounded.

As noted above, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known. The record establishes that the police responded to a complaint, interviewed the complainant and defendant, followed up on the MSP investigation, continued to monitor the situation, and recommended that the prosecutor charge Hyken. *See* ECF No. 68-9 (Det. Pouliot's Report). LaMarche and Pouliot were performing discretionary functions, and Hyken has not shown that their actions violated a clearly established right.

**B. Probable Cause**

The next issue is whether the officers had probable cause for a stalking charge under Michigan law. Hyken's primary argument is that his conduct falls into the safe harbor provision of Mich. Comp. Laws § 75.411(h)(d), and he does not appear to dispute that police otherwise had probable cause to believe that he had violated the stalking statute. And, as explained above, Hyken has not provided case law showing that he had a clearly established right to engage in the stalking-related behavior. Thus, his conduct does not fall within the safe harbor provision.

Probable cause "'is not a high bar' and 'requires only a probability or substantial chance of criminal activity.'" *Mulcahey*, 2026 WL 64236 at *3 (citing *D.C. v. Wesby*, 583 U.S. 48, 57 (2018)). The record indicates that the investigation established probable cause to believe that Hyken's conduct violated of Mich. Comp. Laws. § 750.411h. Relevant portions of the statute are provided above. But, in summary, "stalking" means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that

actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested. Mich. Comp. Laws § 750.411h(1)(e).

Det. Pouliot's investigation shows:

(1) that Hyken's behavior constituted a willful course of conduct in that he repeatedly drove by Van Ginhoven's cupcake shop, stopping on occasion, taking pictures, and yelling profanities at her when he encountered her,

(2) that this contact with Van Ginhoven was unconsented and qualified as harassment because it included:

(a) appearing within her sight,

(b) approaching and confronting her in a public place or on private property,

(c) appearing at her workplace or residence; and

(3) that this unconsented contact would cause a reasonable individual to suffer emotional distress and actually caused Van Ginhoven to suffer emotional distress.

Thus, Pouliot's investigation established probable cause to believe that a stalking violation took place and that Hyken committed this violation.

**C. First Amendment Retaliation**

There is no genuine issue of material fact as to Hyken's First Amendment retaliation claim. In order to establish a First Amendment retaliation claim, a plaintiff must show that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from

engaging in that conduct; and (3) the adverse action was motivated by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). The Sixth Circuit has also employed a burden-shifting approach:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Thaddeus-X*, 175 F.3d at 399.

Hyken asserts that his political criticisms and "gathering of information" are protected under the First Amendment. Hyken's criticisms of Van Ginhoven on Facebook and on podcasts qualify as protected conduct pursuant to the First Amendment. However, Hyken stalking-related activities – repeatedly photographing Van Ginhoven's residence and yelling profane comments at Van Ginhoven *at her home,* after MSP cleared her of election fraud – does not qualify as protected activity for the reasons stated above.

The undersigned also recognizes that the filing of criminal charges, or the recommendation that charges be filed, could be an adverse action. Here, however, Hyken has not demonstrated a genuine issue of material fact as to the causation element. Hyken has not shown that his protected conduct – here, limited to his

criticisms of Van Ginhoven's candidacy, but not including his stalking-related activities – caused LaMarche and Pouliot to investigate and recommend charges against Hyken. Hyken apparently did not depose either officer, and he has provided no evidence indicating that LaMarche referred the case to Pouliot and Pouliot investigated and recommended charges due to Hyken's protected political activities. The undersigned recognizes that the Court must draw all justifiable inferences in favor of Hyken. But the Court may not speculate or imagine evidence that is not in the record. Pouliot's report, which includes Van Ginhoven's initial emails with LaMarche, provides a clear picture of the investigation. Van Ginhoven, as the victim of an alleged crime, reported her concerns to LaMarche. And he referred her case to Pouliot. The record reflects a normal interaction between a victim of an alleged offense and a police officer. LaMarche reviewed the information provided by Van Ginhoven, gave some options, and then referred the case to Pouliot. Nothing in this record indicates that the referral was done for any reason other than to trigger an investigation of what appeared to be a stalking complaint. Hyken could have deposed LaMarche and Pouliot, but apparently he did not. Thus, he has not uncovered any ulterior motives. But even if Hyken had uncovered some causal connection between his protected conduct, the police reports and affidavits provided by the officers demonstrate that they would have taken the same actions despite the protected conduct. As noted above, the investigation established probable cause to believe that Hyken had violated the stalking statute, and he has failed to provide case law that clearly establishes that his conduct fell within the safe harbor provision.

It should also be noted that Det. Pouliot and Director LaMarche were not even the final decision makers in initiating charges – that was Prosecutor Rogg's decision. ECF No. 68-7, PageID.753 (Affidavit of Jeffrey Rogg); ECF No. 68-5, PageID.740 (Affidavit of Sam Pouliot) ("I had no involvement with the Prosecutor's independent decision to initiate charges against Plaintiff."); ECF No. 68-3, PageID.732 (Affidavit of Robert Lamarache) ("I had no involvement with the Prosecutor's independent decision to initiate charges against Plaintiff.").

Therefore, there is no genuine issue of material fact regarding Hyken's First Amendment claims against LaMarche and Pouliot individually.

In addition, Van Ginhoven cannot be held individually liable for a violation of 42 U.S.C. § 1983 because she was not acting under color of state law. In order for a private party's conduct to be under color of state law, it must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *Street*, 102 F.3d at 814. There must be "a sufficiently close nexus between the State and the challenged action of [the defendant] so that the action of the latter may be fairly treated as that of the State itself." *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Hyken has not made this showing. Van Ginhoven could still potentially be held liable of violating Section 1983, based on a conspiracy claim, which is discussed below.

**D. Fourth Amendment Malicious Prosecution**

Hyken also asserts a Fourth Amendment malicious prosecution claim against Det. Pouliot and Direction LaMarche. Defendants Pouliot and LaMarche are

entitled to qualified immunity on Hyken's Fourth Amendment claim because Hyken has failed to establish that their actions violated a clearly established right. Alternatively, there is no genuine issue of material fact as to Hyken's Fourth Amendment claim.

The elements of a Fourth Amendment malicious prosecution claim are:

> (1) that a criminal prosecution was initiated against the plaintiff and that the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty ... apart from the initial seizure; and (4) that the criminal proceeding [was] resolved in the plaintiff's favor.

*Jackson v. City of Cleveland*, 925 F.3d 793, 820 (6th Cir. 2019).

First, the officers did not make the decision to prosecute – that was determined by Prosecutor Rogg. *See Halasah v. City of Kirtland, Ohio*, 574 Fed. Appx. 624, 631 (6th Cir. 2014) ("We have long held that a police officer who did not make the decision to prosecute cannot be held liable for malicious prosecution.")

Additionally, as analyzed in detail above, Det. Pouliot and Director LaMarche had sufficient probable cause to support a stalking charge. Hyken did suffer a deprivation of liberty, notably the bond conditions imposed, and the criminal proceedings were ultimately dismissed. However, two of the four requisite elements are insufficient to maintain a claim. Accordingly, there is no genuine issue of material fact as to Hyken's Fourth Amendment claim against Det. Pouliot and Director LaMarche.

**E. Michigan State Law Malicious Prosecution**

In addition to his Fourth Amendment claim, Hyken also asserts a state law claim for malicious prosecution. Under Michigan law, a malicious prosecution claim requires four elements: (1) that the defendant has initiated a criminal prosecution against plaintiff, (2) that the criminal proceedings terminated in the plaintiff's favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice. *Matthews v. Blue Cross & Blue Shield*, 456 Mich. 365, 378, 572 N.W.2d 603, 609-10 (1998).

Accordingly, just as in the Fourth Amendment context, the existence of probable cause to charge is fatal to Hyken's claim. For the reasons stated above, there is no genuine issue of material fact as to whether there was probable cause to believe that Hyken violated the Michigan stalking statute; the record before the Court shows that there was sufficient probable cause to charge Hyken with stalking.

Furthermore, there is also no genuine issue of material fact as to Defendant Pouliot and LaMarche's motivation in investigating Hyken. As stated above, the record demonstrates nothing more than an ordinary police investigation into a complaint.

**F. Conspiracy Claims**

Hyken also asserts that Defendants conspired to violate his constitutional rights. The Sixth Circuit has explained:

> A civil conspiracy under § 1983 requires "an agreement between two or more persons to injure another by unlawful action." *Bazzi v. City of*

> *Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (citation modified). To state a conspiracy claim, a plaintiff must plead enough facts to support a reasonable inference "that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563 (6th Cir. 2011) (citation modified). And "it is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 400 (6th Cir. 2016) (citation modified).

*Mulcahey*, 2026 WL 64236 at *4.

Here, the record does not support Plaintiff's conspiracy claims. Hyken repeatedly asserts that Defendants engaged in a "plan" to charge Hyken with stalking. ECF No. 73, PageID.799. However, a conspiracy claim requires a plan to derive a plaintiff *of a constitutional right*.

Hyken points to an email exchange between LaMarche and Van Ginhoven to show that they agreed to violate Hyken's constitutional rights. *See* ECF No. 68-4.

First, LaMarche's email to Van Ginhoven is shown below.

> **Hi Kelly**
>
> **There area few options we can take.**
>
> 1. **I can have an officer stop by and you can file a formal complaint. Our officer would then make contact and have a chat with him laying out your concerns. Depending on how the conversation goes it may stop him or he may increase his behavior. The report would then be documented with the officer's findings. You could then get the report and attempt to get a Personal Protection Order from the courts to stop his behavior.**
> 2. **I can have an officer stop by as in Option 1. Upon the conclusion of the investigation the officer can submit a warrant for stalking. The prosecutor would review the case and would either authorize or deny the warrant.**
> 3. **You can make a report, and we do not make contact with him. However, in light of the recent events and his response to you I don't think this is a very good option.**
> 4. **You continue to document his behavior like you have and a report is not made.**

Van Ginhoven's responded:

Thank you for the quick response, Rob. I appreciate you.
After calming down and giving it thought, I would like to proceed.
I would like to proceed with option 2 please.
I am here at my shop today until 4pm or tomorrow 9:30am-4pm

And LaMarche replied:

Hi Kelli

Sounds like a plan. I will be sending down a detective to talk to you today.

Take care
Rob

Hyken asserts that:

> [Van Ginhoven] chose, among the options that LaMarche offered her, a course that would result in Plaintiff Hyken's wrongful arrest. LaMarche agreed to this "plan" and proceeded to dispatch Defendant Pouliot who willingly proceeded with same.

ECF No. 73, PageID.823.

As noted, the Court is obligated to draw all reasonable inferences in favor of Plaintiff. But the Court is not obligated to speculate on or imagine facts that are not in the record. The email exchange above is an exchange between a person complaining of a criminal offense and an officer evaluating that complaint and providing options. Victims of crimes in Michigan have substantial rights. *See* Mich. Comp. Laws § 750.751 *et seq*. Hyken asserts that this conversation has an unlawful purpose; he says that it establishes their agreement to violate his rights. The plain language of this email conversation does not lead to that conclusion. And the Court also cannot reasonably reach that conclusion by inference. Again, Hyken could have deposed these defendants to more thoroughly explore their motives. But he did not.

Det. Pouliot and Director LaMarche responded to and investigated Van Ginhoven's concerns. The officers merely did their jobs as law enforcement officers. There is no indication of an agreement to violate Hyken's rights. In fact, Defendants did not even have the power to decide to prosecute Hyken with stalking; they submitted the evidence to Prosecutor Rogg who ultimately issued the charges. ECF No. 68-7, PageID.753 (Affidavit of Prosecutor Jeffrey Rogg).

Additionally, Kelli Van Ginhoven is a private citizen and was the complainant in the state's case against Hyken. She had no authority in Prosecutor Rogg's decision to initiate charges. ECF No. 71-1, PageID.788 (Affidavit of Kelli Van Ginhoven). As the Michigan Court of Appeals has established:

> Due to the important state policy of encouraging citizens to report possible criminal violations within their knowledge, a defendant cannot be held liable for malicious prosecution unless he took some active role in instigating the prosecution. If the defendant, as complainant, has made full and fair disclosure of all of the material facts within his knowledge to the prosecutor, and the prosecuting attorney recommends a warrant, no recovery may be had against said defendant, for under such circumstances the complainant has not "instituted" the charge. *Renda v. International Union, UAW*, 366 Mich. 58, 83-87, 114 N.W.2d 343 (1962). *Clanan v. Nushzno*, 261 Mich. 423, 428-429, 246 N.W. 168 (1933).

*Rivers v. Ex-Cell-O Corp.*, 100 Mich. App. 824, 833, 300 N.W.2d 420, 424 (1980).

Here, Van Ginhoven exercised her rights as the complainant in a case against Hyken, and Prosecutor Rogg instituted the charge.

Thus, there is no genuine issue of material fact as to Hyken's conspiracy claims for First Amendment retaliation, Fourth Amendment malicious prosecution, or Michigan state law malicious prosecution.

**G. Hyken's *Monell* Claim**

Plaintiff names the City of Escanaba as a defendant in Count 1 of the Complaint. ECF No. 1, PageID.15. Plaintiff asserts that Defendant LaMarche, as the Director of Public Safety for the City of Escanaba, was the "ultimate decision maker" to forward criminal allegations to the Prosecutor. *Id.*, PageID.19. Thus, Plaintiff alleges a *Monell* claim against the City of Escanaba for the violation of Plaintiff's First Amendment Rights. *Id.*, PageID.18-19.

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities could be subject to Section 1983 actions for alleged constitutional violations, albeit in a narrow set of circumstances. "A municipality may not be held liable under § 1983 on a *respondeat superior* theory – in other words, '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691 (emphasis in original)).

The first inquiry in evaluating such a claim is whether the entity had a policy or custom. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). The policy or custom must be the moving force behind the constitutional injury. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003); *Doe*, 103 F.3d at 508–09. "To show the existence of a . . . policy or custom leading to the alleged violation, a plaintiff can identify: (1) the [entity]'s legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of

tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005)).

Hyken does not raise a standard *Monell* claim. Rather, Hyken argues that the Supreme Court's decision in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) specifically applies here. Applying *Monell*, in *Pembaur*, the Supreme Court explained the following regarding an individual's decision rising to municipal liability:

> Monell's language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy," *Monell, supra*, 436 U.S., at 694, 98 S.Ct., at 2037–2038, and whose decisions therefore may give rise to municipal liability under § 1983.
>
> […]
>
> Having said this much, we hasten to emphasize that not every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. See, *e.g., Oklahoma City v. Tuttle,* 471 U.S., at 822–824, 105 S.Ct., at 2435–2436. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

*Pembaur*, 475 U.S. at 481–83.

Hyken's claim against the City of Escanaba fails under both *Monell* and *Pembaur* for several reasons. First, Hyken argues that Director LaMarche was the final decisionmaker. But that power lay within the purview of Prosecutor Rogg.

ECF No. 68-7, PageID.753 (Affidavit of Jeffrey Rogg); ECF No. 68-8, PageID.756 (Misdemeanor Complaint).

Furthermore, as set forth above, the record does not support that the City of Escanaba police caused a violation of Hyken's constitutional rights. Because Hyken's claims against the individual officers fail, his claim against the municipality cannot survive. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point").

Finally, Hyken's *Monell* claim relies completely on his assertion that Defendant LaMarche was the "ultimate decision maker" to forward criminal allegations to the Prosecutor. ECF No. 1, PageID.19. Hyken does not assert that the City of Escanaba engaged in a policy or custom leading to constitutional deprivations.

Accordingly, there is no genuine issue of material fact as to Hyken's *Monell* claim against the City of Escanaba.

**H. Abuse of Process Claim against Kelli Van Ginhoven**

Finally, Hyken asserts an abuse of process claim against Van Ginhoven. Pursuant to Michigan common law, an abuse of process claim requires the following:

> To recover pursuant to a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose, and (2) an act in the use of process that is improper in the regular prosecution of the proceeding. *Friedman, supra,* 412 Mich. at pp. 30–31, 312 N.W.2d 585. In *Vallance v. Brewbaker,* 161 Mich.App. 642, 646, 411 N.W.2d 808 (1987), this Court described a meritorious claim of abuse of process as a situation

> where the defendant has used a proper legal procedure for a purpose collateral to the intended use of that procedure. The Court further stated that there must be some corroborating act that demonstrates the ulterior purpose. *Id.* A bad motive alone will not establish an abuse of process. *Id.*

*Bonner v. Chicago Title Ins. Co.*, 194 Mich. App. 462, 472, 487 N.W.2d 807, 812 (1992)

Here, Kelli Van Ginhoven reached out to law enforcement with stalking concerns. ECF No. 68-6, PageID.743 (Police Report). Those concerns were ultimately corroborated by sufficient probable cause to pursue charges. ECF No. 68-8 (Misdemeanor Complaint). When the case was dropped, Van Ginhoven sought a Personal Protective Order that was eventually denied. ECF No. 68-11 (Petition for PPO). Thus, there is no evidence on the record to support a claim that Van Ginhoven committed an act improper to the regular prosecution of stalking concerns under Michigan state law.

**VI. Kelli Van Ginhoven's Claims against Reid Hyken**

Kelli Van Ginhoven asserts state law counterclaims for defamation and intentional infliction of emotional distress (IIED). Van Ginhoven does not assert any federal claims against Reid Hyken.

Claims under § 1983 can only be brought for "deprivation of rights secured by the constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). Van Ginhoven, however, seeks to invoke this Court's supplemental jurisdiction over state-law claims. In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests

against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *Id.* Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

For the reasons stated above, the federal claims in this case are dismissed. Accordingly, the Court declines to exercise supplemental jurisdiction over Van Ginhoven's state law claims.

**VII. Conclusion**

Therefore, there are no genuine issues of material fact as to Hyken's claims against Defendants. Accordingly, the City of Escanaba Defendants' and Kelli Van Ginhoven's motions for summary judgment are GRANTED. Additionally, the Court declines to exercise supplemental jurisdiction over Kelli Van Ginhoven's state law counterclaims. Thus, this case is DISMISSED.

Dated: September 23, 2026

/s/ *Maarten Vermaat*
MAARTEN VERMAAT
U.S. MAGISTRATE JUDGE